IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.    ) | CR. NO.Case No.: 2:07-cr-311-WKW |
| ) | |
| DOMINICK JEFFERSON    ) | |

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
### DEFENDANT'S MOTION TO SUPPRESS

**COMES NOW**, the Defendant, Dominick Jefferson, by and through undersigned counsel and provides the following in supplement to the Motion to Suppress all evidence and statements illegally seized as a result of the detention, interrogation, searches and seizures involving Mr. Jefferson and the residence in Troy, Alabama on or about February 28, 2007. The evidence due to be suppressed includes but is not limited to: (a) any and all physical evidence seized from the house, its environs, and/or the person of Mr. Jefferson on February 28, 2007, (b) any and all statements made by Mr. Jefferson during or as a result of the illegal detention, interrogation, searches and seizures involving Mr. Jefferson and/or the residence, and (c) any other "fruit" of the illegal detention, questioning, searches and seizures.

**Facts**

At the hearing on this motion, the evidence presented showed the following facts:

1.    On the afternoon of February 28, 2007, Mr. Jefferson was present at a trailer at 163 Butler Drive in Troy, Alabama; Mr. Jefferson was then residing at the trailer.

2.    On the same afternoon of February 28, 2007, police officers Weed and

Ernsberger saw a truck park briefly at the trailer and saw the truck's passenger leave the truck and go inside the trailer and come back to the truck.

3. The officers believed the truck was driven by a person known to them to use drugs and that the driver did not have a valid driver's license.

4. The officers stopped the truck and learned that the passenger, who was not previously known to the officers, was in possession of marijuana.

5. The passenger told the officers that he had purchased the marijuana from "George" inside the trailer.

6. The officers had previously "heard" that someone named "George" was selling drugs at the trailer.

7. The officers did not attempt to obtain either a search warrant or an arrest warrant, but decided to go to the trailer without any warrant.

8. Quatena Webb had also been living at the trailer and was present when the officers arrived. In response to an officer's knock at the home, Ms. Webb came out of the trailer and sat on the front steps.

9. One of the officers told Ms. Webb they were looking for "George" and Ms. Webb told the officers that there was not anyone there named "George," but that her boyfriend "Nick" was present.

10. The officers told Ms. Webb they would not leave the premises until she produced "George."

11. In response to the officers' demand, Ms. Webb went back into the trailer and came back with Dominick Jefferson. She and Mr. Jefferson then sat on the front steps to the trailer.

12. Mr. Jefferson was immediately handcuffed and placed under arrest. The police did not respond to Ms. Webb's questions as to why Mr. Jefferson was arrested.

13. According to Ms. Webb, the officers handcuffed Mr. Jefferson before asking him any questions.

14. The officers asked Mr. Jefferson his name. The name Mr. Jefferson gave initially was not accurate. Ms. Webb stated "Tell the truth."

15. Ms. Webb told the officers that she had been smoking marijuana earlier in the day and that she would produce the marijuana if the officers wanted her to.

16. Officers told Ms. Webb that someone claimed to have purchased marijuana at the trailer. Ms. Webb denied that any such event had occurred.

17. After Mr. Jefferson was already arrested, and after a patrol officer had arrived to take custody of Mr. Jefferson, the officers instructed Ms. Webb to bring them the marijuana from inside the trailer.

18. Ms. Webb went into the trailer, leaving the doors to the trailer open.

19. Ms. Webb walked to the back of the trailer and into her bedroom, and retrieved a shoebox containing small marijuana cigarettes that she had previously smoked.

20. The officers did not ask for permission to enter the trailer.

21. Neither Ms. Webb nor Mr. Jefferson gave the officers permission to enter or the trailer.

22. As Ms. Webb was walking from the back bedroom back to the front door of the trailer, she walked through a hall and kitchen and into the living room and she saw an officer enter the trailer.

23. Ms. Webb saw the officer take a few steps, look around, and walk over to the sofa at the back of the living room, which was four or five steps from the front door. The officer said "Whoa, whoa, what do we have here?" He then picked up a firearm from the sofa.

24. Officer Weed testified that after Ms. Webb went back into the trailer to retrieve the marijuana, Officer Ernsberger stood in the doorway of the trailer, said "1032,"[1] took two to three steps into the trailer, leaned over the sofa, and picked up a firearm. Officer Weed contended that Officer Ernsberger saw the gun when he stepped up to the step. Officer Weed never saw the gun until Officer Ernsberger came back outside of the trailer, holding the gun.

25. It is not illegal to have a gun inside a home in Alabama.

26. The police had no information that either Mr. Jefferson or Ms. Webb was legally prohibited from possessing a firearm.

27. The officers asked Mr. Jefferson if the gun was loaded, and he responded that it was.

---

[1] Officer Weed testified that "1032" indicates that a gun has been seen.

28.     At no time was Mr. Jefferson given any *Miranda* warnings.

29.     Officer Weed testified that "the only reason the weapon was kept is because we ran the serial numbers." (Transcript, p. 68.)

**Supplemental Authority**

**1.     The Fourth Amendment was violated by the officer's entry into the trailer and seizure of the gun.**

At the suppression hearing, there was no contention, by either Officer Weed or the government, that the officers had permission, consent, or any court-issued warrant, permitting their entry of the trailer. Officer Weed acknowledged that he and Officer Ernsberger did not believe they had information establishing probable cause to obtain a search warrant.[2]

"An arrest in the home, however, is plainly subject to the warrant requirement; probable cause alone is insufficient. *Payton v. New York,* 445 U.S. 573, 589-90 (1980); *McClish v. Nugent*, 483 F.3d 1231, 1238 (11th Cir. 2007).     In *McClish*, the Eleventh

---

[2]The truck passenger "cannot be deemed reliable merely by virtue of having provided information to law enforcement. *See United States v. Decoteau*, 932 F.2d 1205, 1207 (7th Cir.1991) (stating that police should proceed with "caution" regarding reports "of victimless or status crimes"); Wayne R. LaFave, *Search and Seizure* § 3.4(a), at 220-21 (3d ed.1996) (explaining that "[p]olice claims that their information was received from an average citizen who was ... a witness to criminal activity should be viewed with healthy skepticism when the nature of the criminal conduct alleged and the relationship of the 'citizen' to that activity is more typical of that found when informants from the criminal milieu are utilized"); *cf. United States v. Wilhelm,* 80 F.3d 116, 120-21 (4th Cir.1996) (holding that anonymous informant was not presumptively reliable merely because he supplied information about marijuana being present and sold in defendant's home)." *Johnson v. City of Aiken*, 2000 WL 263823 (4th Cir. 2000), at 8.

Circuit held that the Fourth Amendment was violated when officers reached into the doorway of a home to effect an arrest. In *Payton*, the Supreme Court held that the Fourth Amendment requires an arrest warrant to enter a home "because the evidentiary inferences used to justify this kind of governmental intrusion should be drawn by a 'neutral and detached magistrate,' not an officer 'engaged in the often competitive enterprise of ferreting out crime.'" and because a warrantless entry into a home necessarily involves breach of the sanctity of the home. *Payton*, at 586 n. 24 and 587; *McClish* at 1239.

Thus, "any physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much . . . there is no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor. **In the home, our cases show,** *all* **details are intimate details, because the entire area is held safe from prying government eyes."** *McClish*, at 1240, n. 11, quoting *Kyllo v. United States*, 533 U.S. 27, 37 (2001) (emphasis added).

"At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. **In terms that apply equally to seizures of property and to seizures of persons, the** *Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."* *McClish,*, quoting *Payton* at 589 - 590 and quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961) (emphasis in *McClish*, and added).

6

Only consent to police entry or recognized "exigent circumstances" create exceptions to the warrant requirement for police entry of a home. *Payton* at 589; *McClish* at 1240. "Exigent circumstances exist if an objectively reasonable officer on the scene would have sufficient grounds to believe an exigency existed." *United States v. Schmidt*, 403 F.3d 1009, 1013 (8th Cir. 2005). A warrantless entry into a residence may be justified if an officer has a reasonable fear of harm. *United States v. Hill*, 430 F.3d 939, 941 (8th Cir. 2005).

Thus, there must be some facts in existence which would objectively support such a fear. Several different factual circumstances have been held to constitute "exigent circumstances:"

> Thus, for example, the courts have upheld exigent circumstances entries to break up a violent fight, *Brigham City v. Stuart,* --- U.S. ----, 126 S.Ct. 1943, 1949, 164 L.Ed.2d 650 (2006), to prevent the destruction of evidence, *United States v. Mikell,* 102 F.3d 470, 476 (11th Cir.1996), to put out a fire in a burning building, *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), to pursue a fleeing suspect, *United States v. Santana,* 427 U.S. 38, 42-43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), to rescue a kidnapped infant, *United States v. Laboy,* 909 F.2d 581, 586 (1st Cir.1990), and to attend to a stabbing victim, *United States v. Gillenwaters,* 890 F.2d 679, 682 (4th Cir.1989). Under either consent or exigent circumstances, an officer who conducts a warrantless search or seizure inside the home bears the burden of proving that his conduct was justified. *See Sammons v. Taylor,* 967 F.2d 1533, 1543 (11th Cir.1992).

*McClish,* at 1240 - 1241. However, each of these exigent circumstances involved more than hypothetical possibilities – in each of the instances, facts existed which did justify the officer's fears.

Officer Weed testified and the prosecutor argued that "officer safety" justified Officer

Ernberger's viewing and/or entrance of the inside of the trailer. However, while "officer safety" is a "legitimate and weighty" concern, *Maryland v. Wilson,* 519 U.S. 408, 412, (1997) (quoting *Pennsylvania v. Mimms,* 434 U.S. 106, 110, (1977) *(per curiam)* ), that concern does not "by itself" justify a full-blown search under all circumstances. See *Knowles v. Iowa*, 525 U.S. 113, 118 (1998).

Typically, the concern for "officer safety" justifies a "search incident to arrest." *United States v. Robinson*, 414 U.S. 218 (1973) (full search of arrestee's person is lawful in connection with lawful arrest); *Chimel v. California*, 395 U.S. 752, 763 (1969) ("There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control' - construing that phrase to mean the area from within which he might gain possession of a weapon or destructible device."). However, any search beyond the arrestee's person or immediate reach must be based on "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 424 U.S. 325, 334 - 336 (1990).

In the present case, Mr. Jefferson was already arrested and secured by the arrival of the patrol officer, and was not near the inside of the trailer. Thus, the search of the trailer was not incident to an arrest.

Ms. Webb had given no indication of danger to the officers, had fully cooperated with them, and had already previously made trips into the trailer in the officers' presence, without

arousing any concern by the officers for their safety. The officers conceded they had no information or reports of any weapons or violent activity at that location. Thus, there was no objective basis for a concern or search of the home "for officer safety."

Nor was this seizure justified by Officer Ernsberger's allegedly "plain viewing" of the weapon. To justify a seizure based on "plain view," the officer must not have violated the Fourth Amendment to arrive at the location at which the view is obtained; the object's incriminating character must be immediately apparent; and the officer must have a lawful right of access to the object. *United States v. Harris*, 390 U.S. 234, 236 (1968); *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006). A public view of the home which is created by a door opened in response to an officer's demand and/or show of authority is not a voluntary or consensual disclosure of the private interior of the home. *United States v. Conner*, 127 F.3d 663, 666 (8th Cir. 1997).

In this case, the officers had required Ms. Webb to display her home to them, by requiring her to go back inside. The officers had no knowledge of any facts which made the presence or possession of the gun inside the home illegal.

If the police lack probable cause to believe an object in plain view is contraband without conducting a further search of the object, the plain view doctrine cannot justify its seizure. *Smith*, 459 F.3d at 1290 (citations omitted). While simply looking at an object in plain view does not constitute a search, "taking action" and moving an item to observe its serial numbers, constitutes a "search" because it "expose[s] to view" something that was

theretofore concealed. *Arizona v. Hicks*, 480 U.S. 321, 325 (1987) (holding that turning a stereo speaker over to observe its serial number constituted an illegal search). Thus in this case, as in *Hicks*, the officers' decision to retain the weapon in order to "run the serial numbers" was a search, which required a warrant.

At the suppression hearing in this case, the Court seemed to express a belief that an officer standing outside a house in which people have been smoking marijuana, and who has some basis for believing a sale of marijuana just took place at that house, is lawfully permitted to enter the house to secure a weapon. But police intuition does not create an exception to the Fourth Amendment's requirements. Moreover, the police in this case went beyond "securing" the weapon, and seized it.

The officers in this case had numerous opportunities to obtain a search warrant and/or an arrest warrant. The officers had numerous opportunities to secure the location and the people at the location, until lawful authority for arrest and/or a search could be obtained. The officers could even have merely secured the weapon itself, while they obtained lawful authority for its seizure. However, they chose to take none of these steps. Instead, their conduct violated the basic Constitutional requirement that the threshold of a home not be breached absent authority through court-ordered warrant. For these reasons, the evidence obtained by their conduct must be suppressed.

**2.     The Fifth Amendment was violated by the officers' questioning of Mr. Jefferson.**

There appears to be agreement by both parties that Mr. Jefferson was in custody and was never given his Fifth Amendment protective warning pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602 (1966), or advised of his right to counsel.

Under *Miranda v. Arizona,* 384 U.S. 436, 444 (1966), "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." While exceptions may exist permitting police to receive and use information provided in a custodial interrogation, those exceptions do not extend to permitting use of the information against the defendant at trial.

A **Miranda** violation raises a presumption of coercion, *Oregon v. Elstad,* 470 U.S. 298, 306-307, and n. 1, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and the Fifth Amendment privilege against compelled self-incrimination extends to the exclusion of derivative evidence, see *United States v. Hubbell,* 530 U.S. 27, 37-38 (2000) (recognizing "the Fifth Amendment's protection against the prosecutor's use of incriminating information derived directly or indirectly from ... [actually] compelled testimony"); *Kastigar v. United States,* 406 U.S. 441, 453 (1972).

In the present case, Mr. Jefferson was asked if the gun found by Officer Ernsberger was loaded. No exigent circumstances or necessity required that the officers obtain this

information from Mr. Jefferson. The gun was in the officers' possession and control and presumably their own police procedures would have caused them to inspect it and secure it safely.

Thus, in the present case, Mr. Jefferson did not waive his Fourth or Fifth Amendment rights, and there were no circumstances supporting a lawful exception to these constitutional protections. Even if police policies or procedures required the officers to obtain information from Mr. Jefferson without proper warnings, no policy requires that the State be permitted to use the statements obtained against Mr. Jefferson at trial.

Thus, Mr. Jefferson is entitled to suppression of all evidence resulting from these constitutional violations. *Wong Sun v. United States*, 371 U.S. 471 (1963).

**WHEREFORE,** Mr. Jefferson asks this Court enter an order prohibiting the use of all information, statements and items seized, and all fruits thereof, during the events on February 28, 2007.

> Respectfully submitted,
>
> **s/Christine A. Freeman**
> **CHRISTINE A. FREEMAN**
> **TN BAR NO.: 11892**
> Attorney for Dominick Jefferson
> Federal Defenders
> Middle District of Alabama
> 201 Monroe Street, Suite 407
> Montgomery, AL 36104
> TEL: (334) 834-2099
> FAX: (334) 834-0353
> E-Mail: Christine_Freeman@fd.org

## CERTIFICATE OF SERVICE

      I hereby certify that on March 31, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Kent Brunson, Assistant U. S. Attorney.

      Respectfully submitted,

**s/Christine A. Freeman**
**CHRISTINE A. FREEMAN**
**TN BAR NO.: 11892**
Attorney for Dominick Jefferson
Federal Defenders
Middle District of Alabama
201 Monroe Street, Suite 407
Montgomery, AL 36104
TEL: (334) 834-2099
FAX: (334) 834-0353
E-Mail: Christine_Freeman@fd.org