IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:07cr311-WKW |
| | ) | (WO) |
| DOMINICK JEFFERSON | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

During the course of a drug investigation, an officer entered Dominick Jefferson's residence without a warrant and seized a gun from the sofa. After the officer stepped back outside the residence, he asked Jefferson whether the gun was loaded, and Jefferson stated that it was. Jefferson was indicted on December 5, 2007, for the unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Jefferson later filed a motion to suppress evidence and statements allegedly obtained in violation of the Fourth and Fifth Amendments to the United States Constitution. (Doc. No. 12.) Jefferson seeks to suppress the .357 Magnum firearm and his statement that the gun was loaded as fruits of an unlawful seizure and detention. Jefferson specifically charges that his detention and the search of his residence were not authorized by a warrant or any exception to the Fourth Amendment. In addition, he asserts that the detention and questioning of him by the officers violated his Fifth Amendment rights because he did not knowingly and voluntarily waive his rights.

On March 26, 2008, the court held an evidentiary hearing on the motion to suppress. Based on the evidence presented during the suppression hearing, the court concludes that the motion should be denied.

## FINDINGS OF FACT

In February 2007, Quatena Webb ("Webb") lived with her boyfriend, Jefferson, in a trailer located next to Highway 87 on 163 Butler Street in Troy, Alabama. Around 1:30 p.m. on February 28, 2007, Webb returned home from visiting a family member. During her testimony she candidly admitted that sometime that afternoon, she smoked a "blunt" of marijuana in the trailer.

Around 4:00 p.m., Drug Task Force Officers Ernsberger and Weed were driving along Highway 87 when they spotted a blue car driven by Dustin Garrett ("Garrett"), a known user of marijuana, turn into the driveway of Jefferson's trailer.[1] Officer Weed had "heard talk on the street that there was something going on there." The officers turned their car around and parked in a residential driveway along the four-lane highway and across from Jefferson's trailer and the Southland Trailer Park.

A passenger got out of Garrett's car and went inside the trailer. After a couple of minutes, the passenger returned, and they drove away. The officers followed them in their vehicle. When a dispatcher confirmed that Garrett's license was suspended, the officers stopped them. During the stop Officer Weed recovered a quarter bag of marijuana from the passenger who said that he bought the marijuana from a black man named "George" who was inside the trailer. Officer Ernsberger arrested the passenger for possession of marijuana. After the officers completed an inventory of the vehicle and insured that a patrol officer would transport the passenger to jail, Officers Ernsberger and Weed went to Jefferson's trailer and knocked on the

---

[1] Officer Weed testified that, less than two years earlier, he was involved in the arrest of Garrett for possession of marijuana.

door.

When Webb heard this she said to herself, "That sounds like a police knock," and she answered the front door. Webb's intuition was correct and she saw Officer Weed at the bottom of the steps and another officer walking around the trailer with his hand on his pistol. The officers asked Webb to step outside and told her to tell George to come outside, too. Referring to "George," Webb asked, "Who is that, sir?" Officer Weed responded, "We know he's in there because we just stopped his buddy and his buddy said that he just came from this residence." Although Webb was emphatic that there was no one in her home named "George," the officers repeatedly insisted that George was inside the trailer. Webb then told the officers that her boyfriend lived with her, but that her boyfriend's name was not George.

At that point, Officer Weed said, "I smell marijuana." Webb told him that she had smoked marijuana earlier and that she had one blunt left. One of the officers then told Webb that, if she did not tell her boyfriend to come outside, he would arrange for a search of the trailer and its contents. At that, Webb went inside, leaving both the screen door and front door open, and asked Jefferson to talk to the officers.

When Jefferson stepped out of the trailer, an officer placed him in handcuffs and asked him to sit on the steps. Officer Weed asked for Jefferson's name and birth date. Jefferson told the officers that his name was "Richard Lamont Jefferson" and gave a birth date. When conducting a check through the National Crime Information Center, the officers were unable to find a name matching the birth date given by Jefferson. The officers explained to Jefferson that they had arrested a man who said he purchased marijuana from a man named "George" in

the trailer. After Webb and Jefferson denied that anyone had purchased marijuana in their trailer, the officers repeatedly asked Jefferson to give them his correct name, and Jefferson continued to give the name "Richard Lamont Jefferson." At some point, Webb leaned over and whispered to Jefferson to "tell the truth," who then told the officers that his name was "Dominick Webb." One of the officers told Jefferson that he was under arrest for obstruction of government operations and placed him in the back of a patrol car.

With Jefferson secured, Officer Weed advised Webb that, if she had any marijuana, she should bring it to him. Webb decided to comply and walked into the trailer to retrieve a shoe box containing a small amount of marijuana. Officer Ernsberger walked to the top step of the exterior steps from where he looked into the living room of the trailer. Officer Ernsberger said, "10-32," which is code indicating the presence of a firearm. Officer Ernsberger then took several steps into the living room and said, "What do we have here?" He was referring to a pistol sitting on the sofa which he picked up. Officer Ernsberger walked out of the trailer while holding the pistol, and asked Jefferson, "Is it loaded?" Jefferson responded that the gun was loaded.

A few minutes later, a patrol officer transported Jefferson to the jail. The officers later checked the serial numbers on the pistol as well as Jefferson's criminal history and charged Jefferson with being a felon in possession of a firearm.

**DISCUSSION**

**A. The Credibility of the Witnesses**

At the hearing there were some conflicts between Webb's and Officer Weed's testimony.

4

For instance, Officer Weed testified that both he and Officer Ernsberger stood at the foot of the steps and talked to Webb. He also stated that Webb referred to her boyfriend as "George" and that she initially told him that "George" had left the trailer. Webb, however, testified that one officer was pacing back and forth around the trailer when she opened the door and that she told Officer Weed that she did not know anyone named "George." In addition, Officer Weed testified that Jefferson was handcuffed after he admitted to giving the officers a false name, but Webb testified that the officers immediately handcuffed Jefferson when he exited the trailer.

It is not at all clear that these conflicts in the testimony are material to the court's inquiry in resolving the motion to suppress. However, given the importance of the issues, the court will proceed with determination of the credibility of the witnesses. In so doing, the court recognizes that it is improper to determine credibility based on the "status" of a witness. *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). Rather, the court must weigh the testimony of these two witnesses in light of all the facts, taking into account their interests, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand. *Gallego v. United States*, 174 F.3d 1196, 1198 (11th Cir. 1999). After weighing the testimony of Webb and the testimony of Officer Weed, the court finds that Webb's testimony is credible. The court also finds Officer Weed to be credible, but recognizes that his testimony took place over a year after the arrest occurred and after he participated in several drug investigations as part of a drug task force over the same time frame. Specifically, the court finds Officer Weed's recollection to be somewhat less vivid than Webb's recollection of events. For example, Officer Weed testified that he did not recall whether there was a screen door on the trailer and did not

5

remember the first name of the passenger who told him about "George." He also did not recall whether Webb told him that she smoked marijuana or that someone else had done so in the trailer. Webb, however, gave detailed testimony concerning these facts, including an admission that she smoked marijuana in the trailer. Moreover, when taking into account the demeanor of the witnesses, Webb was more confident when recalling specific events. Under these circumstances, the court finds that, with respect to any conflicts in the testimony, Webb's recollection of events is more credible, and this finding is reflected in the court's findings of fact.

### B. The Seizure of the Firearm

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV.[2] The Amendment's primary purpose is to protect citizens from unwarranted governmental intrusion and to prevent abusive police power. *See Johnson v. United States*, 333 U.S. 10, 13 (1948); *United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980) (plurality opinion). The Fourth Amendment draws a firm line at the threshold of a residence because "'[a]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Payton v. New York*, 445 U.S. 573, 589-90 (1980) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Absent exigent

---

[2]The entire text of the Amendment provides:

[T]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

6

circumstances, the threshold may not be crossed without a warrant. *Payton*, 445 U.S. at 590.

First, the court notes that the Fourth Amendment is not implicated by an officer's entry upon private land to knock on a citizen's door for legitimate police purposes. *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)). "Absent express orders from the person in possession, an officer may walk up the steps and knock on the front door of any man's castle, with the honest intent of asking questions of the occupant." *Taylor*, 458 F.3d at 1204 (internal quotations omitted). Thus, an officer is "allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just an any private citizen may." *Id*.

The officers' initial approach to Jefferson's trailer was for just such a "knock and talk." Shortly after officers about a purchase of marijuana from a man named "George" in the trailer, Officers Ernsberger and Weed parked in the trailer's driveway and knocked on the front door in order to investigate those allegations. When Webb answered the door, the officers identified themselves and told her the purpose of their visit. Officer Weed asked to speak to "George" or her boyfriend. This conduct is not prohibited by the Fourth Amendment.[3] *See Taylor*, 458 F.3d at 1204.

The more pressing issues in this case are whether it was constitutionally permissible for Officer Ernsberger to follow Webb up to the top step and look into the living room when Webb re-entered the trailer and whether exigent circumstances existed to permit him to cross the

---

[3] Webb's testimony indicated that, when she opened the door, she saw one of the officers walking around the side of the trailer and looking around the area. At that time, the officers had a reasonable suspicion that drug activity had occurred inside the trailer. Consequently, the officer's quick scan of the area around the trailer to determine whether any exigencies existed was not prohibited by the Fourth Amendment.

7

threshold, walk into the living room, and seize the firearm. The presence or absence of exigent circumstances must be examined as the circumstances arise. *United States v. Rodgers*, 924 F.2d 219, 223 (11th Cir. 1991) (citing *Cardwell v. Lewis*, 417 U.S. 583, 595 (1974)). Based on all of the circumstances, the court concludes that Officer Ernsberger was confronted with exigent circumstances sufficiently compelling that the brief, warrantless entry into Jefferson's trailer for the purpose of securing the pistol for his safety and the safety of others was objectively reasonable under the Fourth Amendment. *See Mincey v. Arizona*, 437 U.S. 385, 394 (1978).

First, there is no dispute that Officer Weed smelled the odor of marijuana permeating from the trailer's opened front door and that Webb was aware of the officers' suspicions. In some cases, the opening of a door may give rise to exigent circumstances.[4] *McClish v. Nugent*, 483 F.3d 1231, 1247 (11th Cir. 2007) (citing *United States v. Tobin*, 923 F.2d 1506, 1511-12 (11th Cir. 1991) (holding that an exigency was created when the officer standing by an opened door smelled marijuana and the suspect would have been aware of the officer's suspicions), and *United States v. Poe*, 462 F.3d 997, 1001 (8th Cir. 2006) (finding that the seizure of a firearm exposed in plain view after the suspect opened the door was justified by the exigent circumstance of officer safety)).

---

[4] The court recognizes that an officer during a "knock and talk" may not gain entry to a residence by way of any show of official authority. *United States v. Ramirez-Chilel*, 289 F.3d 744, 751 (11th Cir. 2002). In this case, Officer Weed wore plainclothes with a police vest, knocked on the door twice in rapid succession, and asked Webb to talk to talk to him outside the trailer. Although testimony indicated that the officers were armed, nothing indicates that they drew their weapons at any time. The court finds that, under these circumstances, there was no showing of official authority. *See Tobin*, 923 F.2d at 1512 (finding that plain clothes agents without weapons drawn who knocked continuously for three to four minutes while calling out requests to the occupant to open the door did not make a showing of official authority). *Cf. United States v. Edmondson*, 791 F.2d 1512, 1514 (11th Cir. 1986) (where agents wishing to discover the identity of a person inside an apartment drew their weapons, knocked on the door, and yelled, "FBI. Open the door," the court found the agents did make a showing of official authority).

While outside the trailer, Webb admitted to the officers that she had smoked marijuana earlier that day and that some marijuana remained in the trailer. Consequently, when Webb, who may have been under the influence of marijuana, re-entered the trailer to retrieve the remaining marijuana, it was objectively reasonable for Officer Ernsberger to move to the top step outside the open front door and in the interest of officer safety watch Webb walk to her bedroom. In other words, Officer Ernsberger had a right to stand where he was standing. *Cf. Rodgers*, 924 F.2d at 221 (finding that sergeant who decided to close the front door to a trailer after arresting a suspect had a "right to stand where he was standing" when he saw guns inside the trailer). The court therefore concludes that Officer Ernsberger did not violate the Fourth Amendment in moving to the top of the stairs where the living room and its contents could be viewed.

Officer Ernsberger's concerns for safety crystalized when he saw a gun sitting on top of the sofa.[5] The warrantless seizure of a gun is "objectively reasonable" under the Fourth Amendment when there is a real concern for the safety of the officers present or the public. *New York v. Quarles*, 467 U.S. 649, 653 n.3 (1984); *United States v. Newsome*, 475 F.3d 1221, 1226 (11th Cir. 2007).[6] Given that Webb had stepped out of the officers' view, that her

---

[5] Officer Weed and Webb gave conflicting testimony as to the specific location of the sofa. Officer Weed believed that the arm of the sofa was next to the front door; Webb, however, testified that the sofa was across the room and next to the bar area. Nonetheless, there is no dispute that the front door opened into the living room, that a sofa was in the living room, and that a firearm was sitting on top of the sofa. The court therefore finds that, when Ernsberger looked into the living room, the pistol was clearly visible to him on the sofa.

[6] Exigencies include the elimination of any immediate safety risks to officers or others and the presence of firearms. *See United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997); *United States v. McKinney*, No. 3:06CR176-D, 2007 WL 3507781, at *1 (N.D. Miss. 2007).

boyfriend was under arrest, and that she may have been under the influence of marijuana at the time the firearm was seen, it was not unreasonable for Officer Ernsberger to fear leaving a gun unattended in the living room while Webb was inside the trailer. Thus, it was objectively reasonable for Officer Ernsberger to enter the living room and seize the firearm as Webb approached the room. In short, the seizure of the firearm was justified by the exigent circumstance of officer safety. *See Quarles*, *supra*; *United States v. Crawford*, No. 1:07cr116-WSD, 2007 WL 4224735 (N.D. Ga. 2007) (slip opinion) (citing *United States v. Poe*, *supra*). Moreover, the intrusion was minimal. Although Officer Ernsberger looked around while he was in the living room, as soon as he picked up the weapon, he stepped back outside. The seizure of the firearm as well as the manner of the seizure was reasonable under the circumstance and was not a violation of the Fourth Amendment.

### C. The Statement

During Officer Ernsberger's brief entry into the trailer, Jefferson remained outside, handcuffed. As Officer Ernsberger stepped outside with the weapon in hand he asked Jefferson if it was loaded. Jefferson contends that his verbal acknowledgment that the gun was loaded should be suppressed because the officer's questioning violated his Fifth Amendment right against self-incrimination. Jefferson contends that he was under arrest, and the statement was made before he received *Miranda* warnings. Jefferson further argues that the public safety exception does not apply in this case because any danger to the officers was neutralized prior to the questioning.

The Self-Incrimination Clause provides: "No person ... shall be compelled in any

criminal case to be a witness against himself." U.S. CONST., AMDT. 5.  The core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial.  *United States v. Patane,* 542 U.S. 630, 637 (2004). The decision in *Miranda v. Arizona*, 384 U.S. 436, 445 (1966), established that custodial interrogation cannot occur before a suspect is warned of his right against self-incrimination. *Miranda's* fundamental purpose is "to assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process." *Id*. at 469.  To this end, the *Miranda* Court adopted prophylactic rules designed to insulate the exercise of Fifth Amendment rights from government "compulsion, subtle or otherwise," that "operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." *Miranda*, *supra*, 384 U.S., at 474

    Based on the undisputed facts, the court finds that Jefferson was in custody and was not warned of his rights before Officer Ernsberger discovered the firearm and asked, "Is it loaded?" However, as previously discussed, *New York v. Quarles*, *supra*, established a narrow exception to *Miranda* where there is a threat to the safety of officers or the public.  Specifically, the public safety exception allows officers to question a suspect without first advising him of his *Miranda* rights when necessary to protect either themselves or the general public.  *Newsome*, 475 F.3d at 1224 (citing *Quarles*, 467 U.S. at 655-58).  The exception does not depend upon the subjective motivation of the questioning officers; the exception applies when "police officers ask questions reasonably prompted by a concern for the public safety." *Id*. at 656.  It, however, does not apply to "questions designed solely to elicit testimonial evidence from a suspect." 467

U.S. at 659.

> This is not to say that a conversation which begins as an interrogation to determine the need for emergency assistance cannot, as the Indiana Supreme Court put it, "evolve into testimonial statements," [*Hammon v. Indiana,*] 829 N.E.2d [444], 457 [(Ind. 2005)], once that purpose has been achieved. In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises). The operator then told McCottry to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, McCottry's statements were testimonial, not unlike the "structured police questioning" that occurred in *Crawford* [*v. Washington*], 541 U.S. [36], 53, n. 4, 124 S. Ct. 1354 [(2004)]. This presents no great problem. Just as, for Fifth Amendment purposes, " police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect," *New York v. Quarles*, 467 U.S. 649, 658-659, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984), trial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial.

*Davis v. Washington*, 547 U.S. 813, 828-29 (2006).

Applying the public safety exception in the Fifth Amendment context where the defendant is already in handcuffs and is secure has presented a greater problem than the Supreme Court predicted. *Compare United States v. Liddell,* 517 F.3d 1007 (8th Cir. 2008) and *United States v. Fox*, 393 F.3d 52 (1st Cir. 2004) (applying the public safety exception)(vacated and remanded on other grounds, *Fox v. United States*, 545 U.S. 1125 (2005)) with *United States v. Williams*, 483 F.3d 425 (6th Cir. 2007); *United States v. Mobley*, 40 F.3d 688 (4th Cir. 1994); and *United States v. Raborn*, 872 F.2d 589 (5th Cir. 1989) (refusing to apply the exception because with defendant restrained there was no reasonable concern for public safety).

In *United States v. Thomas*, 190 F. Supp. 2d 49 (D. Me. 2002), officers spotted a gun and asked the defendant, "What is this?" and "Is it loaded." The court found that the public safety

exception did not apply because by the time the questions were answered the officer "knew or had reason to believe that Defendant was a felon. This made immediately apparent the incriminating nature of the gun and, therefore, of questions about the gun." *Id.* at 63. Furthermore, the officer testified that because he was a firearms instructor, he would have treated the weapon as if it were loaded under any circumstances.

The court will not spend time asking if *Thomas'* analysis is correct; it is factually different from the case now before the court. Here, it is correct that the officer had already taken possession of the weapon, and Jefferson was outside the trailer in handcuffs. Immediately after picking up the firearm, Officer Ernsberger left the trailer and asked Jefferson whether the gun was loaded. Obviously, a loaded firearm is more dangerous than one which is not loaded. For the protection of himself and Officer Ernsberger, as well as individuals around or near the trailer park, Officer Ernsberger was justified in asking whether the gun was loaded. Moreover, the totality of the circumstances persuades the court that the question was not posed for purposes of interrogation. It was the only question posed to Jefferson, and it came immediately on the heels of the officer finding the weapon. For anyone encountering an unfamiliar firearm, it is a natural question to ask, and its answer gives valuable information about how to handle the weapon safely.[7] The officer's question and Jefferson's acknowledgment that the gun was loaded falls squarely within the public safety exception; the acknowledgment was not testimonial, and its admission does not violate the Fifth Amendment.

---

[7]To the extent that *United States v. Thomas*, 190 F. Supp. 2d 49 (D. Me. 2002), holds that the safety exigency evaporates when an officer treats any weapon as loaded, the court disagrees. How one treats a weapon and whether it is in fact loaded are distinct and knowledge that a weapon is loaded is relevant to safety regardless of the manner in which a weapon is handled.

## CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the defendant's motion to suppress (doc. # 12) be DENIED. It is further

ORDERED that the parties shall file any objections to the said Recommendation on or before **April 21st, 2008.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects. Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Secur., Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 8th day of April, 2008.

                                               /s/Charles S. Coody
                                               CHARLES S. COODY
                                               CHIEF UNITED STATES MAGISTRATE JUDGE